Filed 7/11/14  P. v. King CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>JERRY LEE KING, Jr.,<br><br>　　　　Defendant and Appellant. | A137858<br><br>(Lake County<br>Super. Ct. No. CR926466) |

On May 7, 2011, defendant Jerry Lee King's young friend, M.W., argued by text and phone with Tina M., whom he wanted to be his girlfriend.  A friend of Tina M. challenged M.W. to fight.  King drove M.W. to the house where Tina M. was attending a party.  Three men approached King's vehicle and King fired two shots at them with a semiautomatic pistol through the car window, severely wounding Marvin Turl.  After dropping off M.W., King proceeded to the apartment complex where his girlfriend, Ashlee Hernstedt (Ashlee), lived.  There, by text and phone, King argued with the boyfriend of Tiffany Hernstedt (Hernstedt), Ashlee's sister.  Following this argument, King brandished his pistol at Hernstedt's door, making threats.

King was tried for the shooting and the brandishing at the same time.  A jury found him guilty of six of the seven counts with which he was charged and the court sentenced King to 31 years to life in prison.

On appeal, King contends:  (1) the court erred in denying his motion to sever the charges related to the shooting from the charges related to the brandishing; (2) the court's

sentence constituted cruel and unusual punishment; and (3) the court erred in calculating the length of concurrent sentences that were stayed, pursuant to Penal Code section 654.[1] King's contentions are without merit and we affirm.

**BACKGROUND**

**I. *Procedural Background***

On December 2, 2011, the People filed an information charging King with seven counts: (1) attempted murder of Turl (§ 664/187, subd. (a)); (2) assaulting Turl with a firearm (§ 245, subd. (a)(2)); (3) grossly negligent discharge of a firearm (§ 246.3, subd. (a)); (4) malicious discharge of a firearm from a vehicle (§ 12034, subd. (c));[2] (5) carrying a weapon concealed within a vehicle (§ 12025, subd. (a)(1));[3] (6) carrying a loaded firearm within a vehicle while in a public place (§ 12031, subd. (a)(1));[4] and (7) brandishing a firearm in a public place (§ 417, subd. (a)(2)).

An allegation of personal discharge of a firearm causing great bodily injury (§ 12022.7, subd. (a)) accompanied each of counts 1 through 4. In addition, an allegation of personal discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)) accompanied counts 1 and 4. Also accompanying count 1 were the following allegations: (1) personal discharge of a firearm (§ 12022.53, subd. (c)); (2) personal use of a gun (§§ 12022.5, subd. (a)(1), 12022.53, subd. (b)); and (3) personal use of a handgun (§§

---

[1] Unless indicated otherwise, all statutory citations are to the Penal Code.

[2] Section 12034 was repealed, effective January 1, 2012. (Stats. 2010, ch. 711, § 4, No. 10 West's Cal. Legis. Service, p. 4138.) The crime of malicious discharge of a firearm from a vehicle is now prohibited by section 26100, subdivision (c). Also effective January 1, 2012, section 12022.53, subdivision (d), was amended to apply to section 26100 rather than to section 12034.

[3] Section 12025 was repealed, effective January 1, 2012. (Stats. 2010, ch. 711, § 4, No. 10 West's Cal. Legis. Service, p. 4138.) The crime of carrying a weapon concealed within a vehicle is now prohibited by section 25400, subdivision (a)(1).

[4] Section 12031 was repealed, effective January 1, 2012. (Stats. 2010, ch. 711, § 4, No. 10 West's Cal. Legis. Service, p. 4138.) The crime of carrying a loaded firearm within a vehicle while in a public place is now prohibited by section 25850, subdivision (a).

1203.06, subd. (a)(1), 12022.5, subd. (a)). Associated with count 2, the information alleged personal use of a handgun (§ 12022.5, subd. (a)). On the People's request, an allegation that the attempted murder was willful, deliberate and premeditated was dismissed prior to trial.

A jury acquitted King on count 1 and found him guilty on the remaining counts. The jury found the special allegations with respect to counts 2 through 4 to be true. It also found that the brandishing alleged in count 7 occurred in a public place.

At sentencing, the court designated count 4 as the principal offense, for which it sentenced King to a term of 5 years, consecutive to an indeterminate term of 25 years to life for the section 12022.53, subdivision (d), enhancement. The court imposed a sentence of one year for each of counts 5 and 6, both terms to be served concurrently with the principal term. The court also imposed a one-year term on count 7, to be served consecutive to the principal term. Sentence on the remaining counts and allegations was stayed.

King timely filed a notice of appeal on January 31, 2013.

## II. *Factual Background*

## A. *The Shooting Incident[5] on May 7, 2011*

On May 7, 2011, the almost 19-year-old King had a gun in his car. The gun was a Hi-Point model CF .380 semiautomatic pistol and was registered to Michael Roy, King's brother-in-law, with whom King lived. King testified that Roy met him at a gas station that morning, gave him the gun, and asked him to take it home. King placed the gun under the front passenger seat of his car and did not take it out when he returned home because it "skipped [his] mind."

---

[5] The charges relate to two incidents—a shooting on May 7, 2011, and the brandishing of a firearm in the early morning of May 8, 2011. We refer to the former as "the shooting incident" and the latter as "the brandishing incident." Charges 1 through 4 relate to the shooting incident, and we refer to these as "the shooting charges." The remaining charges relate to the brandishing incident and we refer to them as "the brandishing charges."

David Rogers was a friend of King's and King spent the afternoon and early evening at Rogers's house. Monique Throop[6] and M.W., who was 13 years old at the time, were also there.

Meanwhile, Tina M., who was 17 years old, Travis Yudnich, Douglas Davis, Turl, Tonya Sullivan and others attended a Mother's Day barbecue at the home of Sullivan's mother. Tina M. began to receive text messages and phone calls from M.W., who wanted to be her boyfriend. At first, the interchange was friendly, but M.W. became angry when Tina M. refused his entreaties. M.W. continued his messages and calls to Tina M. after the party moved to Turl's and Sullivan's residence, on Walnut Street in Clearlake. Tina M. had her phone on speaker, so M.W.'s pleas were heard by others. Sullivan was annoyed, picked up the phone, and had a verbal altercation with M.W. Tina M. testified that Sullivan challenged M.W. to come over in a "threatful way," specifying her address. Tina M. heard King's voice in the background over the phone. King said that they had a gun.

M.W. told King that he had been challenged and that he wanted to go to Sullivan's house and fight. He asked King for a ride.[7] King and M.W., accompanied by Rogers and Throop, went to Sullivan's house. Before leaving, King remembered that the gun was in the car, but he did not take it into the house. When they arrived, King parked near the corner at Redwood Street. It was undisputed that after arrival, King fired at least two shots from his car in the direction of Turl, Yudnich, and Davis, striking Turl.

Turl, Yudnich, and Davis all testified that gunshots came from King's car without provocation on their part. However, shortly after the shooting Turl told a police officer that an exchange of racial epithets had preceded the shooting. Yudnich testified that he threw his pocket knife at King's car as it left after the shooting.

King relied on a self-defense claim during trial. M.W. testified that when they arrived, Turl, Yudnich and Davis argued with them, calling M.W. a "nigger" and

---

[6] Throop is also identified as Martinique in the record.

[7] King testified that he did not want M.W. to go alone and offered to drive him.

4

threatening to beat him.  M.W. saw that one of the men held a knife.  They began to run toward King's car.  As the attackers ran they used the "N word."  The knife was thrown at the car, at which point King fired two shots out the passenger window at the approaching group.

King's testimony was similar to M.W.'s.  He and M.W. got out of the car after they arrived.  As soon as they did, he heard yelling and saw "big white guys" approaching at a fast pace and yelling, "We're going to fuck you niggers" and "We're going to kill you."  King and Rogers asked, "Is there a problem?" and one of the men replied, "Fuck yeah, there's a problem, niggers."

As the men began to run toward them, King saw that one of them had a knife.  He yelled to M.W., "He's got a knife.  Get back in the car."  The only thing he could think of was stopping the person with the knife.  So he leaned into the car across the driver's seat, grabbed the gun from under the passenger seat, pointed it out the window and fired at the closest person, who was at most 15 feet away.  King stopped shooting when the men stopped advancing.

King was five feet, five inches tall and M.W. was even smaller.  They were "fairly smaller" than the three men.  King testified, "I was trying to stop him.  I figured that if I stopped one, it will stop all of them."

A recorded interview with M.W. was played for the jury.  In the interview, M.W. said that King and Rogers laughed as King was shooting.[8]

As a result of Turl's injury, a bullet is permanently lodged in the base of his spine, causing him constant pain and preventing him from doing things he used to do.  A doctor and a nurse testified as to the extent of Turl's injuries and resulting disabilities.

After the shooting, King dropped Rogers and Throop off at Rogers's house.  King parked in the driveway of his house, got the keys to the van, and drove M.W. home.  He returned home and then decided to go to Ashlee's residence.  He stated that he took the

---

[8]  Prior testimony by Rogers was read to the jury.  Rogers did not recall that King was laughing.

gun with him and put it in the van because he was worried that the men he had encountered would come after him.

The police were dispatched to the scene of the shooting about 9:48 p.m. During subsequent investigation, the police found one ejected, semiautomatic .380 ACP caliber casing inside King's car, on the passenger side. The police did not find casings or a pocket knife on the street. The spent casing had been fired from Roy's gun and matched the live ammunition later recovered at the scene of the brandishing incident.

## B. *The Brandishing Incident on May 8, 2011*

Hernstedt was Ashlee's sister and they lived in the same apartment complex in Clearlake. On the night of May 7, 2011, she heard King tapping on her window and King asked, "Where the fuck is your sister at?" Hernstedt said she didn't know and told King to leave her alone. Hernstedt was scared, so she called her boyfriend, Perry Bishop, to tell him what had happened. King pounded on Hernstedt's door about 30 minutes later. She looked through the peephole and told him to go away. King pulled out a gun, cocked it and said, "This is for your boyfriend. Don't have him call me ever again." Hernstedt called the police. Her 911 call was logged at 12:22 a.m. on May 8, 2011.

The police arrived and contacted Hernstedt. They then encountered King as he left Ashlee's apartment. King was "[v]erbally aggressive," "yelling expletives" such as "[f]ucking niggers." The police handcuffed King and detained him in a patrol vehicle. King gave his consent for the police to retrieve the gun from the van. In the van, which was registered to Roy, the police found the gun. The gun contained five live rounds. It was "functional, operable, and in proper working condition."

King testified that he had knocked on Hernstedt's door while looking for Ashlee. Hernstedt yelled at him not to come over at that time of night. He was waiting for Ashlee to arrive when he received a text message from Bishop telling him not to yell at Hernstedt. King called Bishop and Bishop told him that he would "fuck [him] up" and "beat [him] until [he] couldn't walk" if he went to Hernstedt's again. King testified that he retrieved the gun from the van, took out the bullets and brandished it in front of

6

Hernstedt's door while telling her not to "have [her] boyfriend coming over here trying to fight [him]." King then put the gun back into the van.

King conceded that his conversation with Bishop did not justify his using the gun. He explained that he was "sh[a]ken up" and "besides [himself]" because of the shooting. When Bishop threatened him, he snapped. He went to Hernstedt's door with a gun so that she would call Bishop and tell him not to come. King reloaded the gun before putting it back in the van because he believed that Bishop might still come to the apartment complex. King acknowledged that he drove with a loaded gun prior to the shooting and when he drove from his house to Ashlee's apartment.

## DISCUSSION

### I. *Severance of Charges*

Prior to trial, King moved to sever the three misdemeanor brandishing counts from the felony shooting counts. Following a hearing, the court denied King's motion. King contends that the court erred in denying his motion and that his case was prejudiced as a result. We discern no abuse of discretion.

### A. *Legal Standard*

Section 954 provides, in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses . . .; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

When charges have been properly joined pursuant to section 954, we review the denial of a motion to sever for abuse of discretion. (*People v. Smith* (2007) 40 Cal.4th 483, 510.)

### B. *Section 954 Permits Joinder of the Counts Against King*

King contends that section 954 does not permit joinder of the shooting charges with the brandishing charges because they are neither "of the same class of crimes" nor

7

"connected together in their commission."[9] We conclude that the shooting incident and the brandishing incident were connected together in their commission, so we need not consider whether they are of the same class of crimes.

" 'Offenses "committed at different times and places against different victims are nevertheless 'connected together in their commission' when they are . . . linked by a ' "common element of substantial importance." ' [Citations.]" ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 119.)[10]

"Where an accusatory pleading charges separate offenses each involving the use of the same gun in their commission, the joinder has been held to be proper under section 954." (*People v. Pike* (1962) 58 Cal.2d 70, 84; accord, *Walker v. Superior Court* (1974) 37 Cal.App.3d 938, 941; see also *People v. Kemp* (1961) 55 Cal.2d 458, 475 [it was a common element of substantial importance that "appellant was armed with the same gun and the gun was used in each set of offenses"]; *People v. Walker* (1952) 112 Cal.App.2d 462, 471 (*Walker*).) In *People v. Scott* (1944) 24 Cal.2d 774, 779 (*Scott*), the court upheld joinder because: "The possession of the firearm in the present case intimidated the complainant and was therefore an important element of the rape. It was also the basis of the offense charged under the Dangerous Weapons' Control Law. The possession of the weapon was thus a common and important element of each crime."

King states that "*Scott* is clearly distinguishable. It did not involve two transactionally distinct incidents and it did not hold that the mere fact that a gun was used in two disconnected episodes was a sufficient substantial commonality to warrant the

---

[9] The People contend that King is "barred by the doctrine of judicial estoppel" from arguing that section 954 does not permit joinder because King's defense counsel conceded that joinder was permitted at the hearing on his motion to sever counts. The People cite no authority holding that such a concession waives the issue on appeal. We do not consider the question because the People prevail on the merits.

[10] King makes an argument that when the Legislature first permitted joinder of charges " 'connected together in their commission' " in 1915, it did not intend to permit joinder of different offenses if they did not relate to the same act or transaction. King's argument was rejected by the California Supreme Court in *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1218.

8

joinder. On the contrary; in *Scott*, the *use* of the gun was necessary to show force and absence of consent with respect to the rape charge. That *same use*, involving as it did *possession*, also showed unlawful possession as a *factually* included lesser offense. In this case, the possession and brandishing involved in the second incident were not factually included offenses in the first." King has misread *Scott*. In *Scott*, the Dangerous Weapons' Control Law charge was for changing, altering, removing, or obliterating identification marks from the firearm (for which possession of the altered firearm was presumptive evidence that the possessor had performed the alteration.) (*Scott, supra*, 24 Cal.2d at p. 778.) Thus, the charge under the Dangerous Weapons' Control Law was not, as King asserts, a "*factually* included lesser offense."[11]

King also seeks to distinguish *Walker* as "inapposite to the present case" because it "was a case of cross-admissibility of an evidentiary fact in support of an inference of identity." To the contrary, the *Walker* court was explicitly addressing a question of improper joinder when it wrote: "Moreover, a joinder of distinct offenses is permissible if there is a common element of importance in their commission. [Citation.] Such a common element here appears in that the appellant was armed with the same gun and the gun was used in each set of offenses." (*Walker*, *supra*, 112 Cal.App.2d at p. 471.)

King attempts to convince us that "older cases in this area tend to use the term 'common element' when they are in actuality discussing 'cross-admissibility' of an evidentiary fact to establish identity, scheme or intent. That usage unfortunately tends to confuse the statutory pre-requisites for joinder with the evidentiary prejudice analysis involved in motions to sever and the question of cross-admissibility." King cites no

---

[11] King discusses *Scott* more adequately in his reply brief. He states: "[I]t appears that there was no other evidence of defendant's possession or tampering other than his possession of a tampered with gun *at the time of the rape.*" We find nothing in Scott that justifies this conclusion. *Scott* provides only a brief factual summary and simply states that "[t]he evidence as to Count V shows that defendant had in his possession an automatic pistol, and that someone had tampered with the identification marks in violation of the statute." (*Scott*, *supra*, 24 Cal.2d at p. 778.) There is no basis for concluding, as King does, that the only evidence of defendant's possession of the pistol was evidence of possession during the rape.

9

authority in support of that argument, and his example (*Walker*) does not support the argument.

The cases holding that use of the same gun is a common element of substantial importance are older cases, but they are still good law. King cites no case to the contrary. Section 954 permits joinder of the shooting charges and the brandishing charges.

## C. *The Court did not Abuse Its Discretion*

Further, even if cross admissibility were required under section 954, the brandishing evidence would have been admissible in a separate trial on the shooting charges here. "In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.'[12] [Citation.] Although our assessment 'is necessarily dependent on the particular circumstances of each individual case, . . . certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.' [Citation.]

"First, we consider the cross-admissibility of the evidence in hypothetical separable trials. [Citation.] If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges. [Citation.]" (*People v. Soper* (2009) 45 Cal.4th 759, 774-775 (*Soper*).)

The prejudice that King asserts was that the jury improperly used evidence of King's brandishing of the gun at Hernstedt as character evidence, tending to negate his cognizable claim of self-defense and lowering the People's burden of proof. King does not contend that evidence of the shooting incident prejudiced his defense on the brandishing charges.[13] Accordingly, we focus only on whether evidence of the

_____

[12] The parties and the court relied on the preliminary hearing testimony.

[13] In closing argument, defense counsel conceded the brandishing-incident charges: "[L]et me relieve you of responsibility that you really don't have, and that is the responsibility to decide counts 5, 6, and 7, the brandishing charge at . . . Hernstedt's

10

brandishing incident would have been admissible in a hypothetical separate trial of the shooting charges.

The People argue that evidence of the brandishing-incident was relevant to prove King's intent during the shooting incident. King contends that this argument is "misplaced." He points out that brandishing (§ 417, subd. (a)(2)) is a general intent crime, while the attempted murder requires a specific intent. His contention seems to be that the willful engagement in a general intent crime cannot be relevant to prove the specific intent that is an element of a specific intent crime.

King's argument fails because a specific intent may be inferred from King's actions during the brandishing incident, even though such an intent was not an element of any of the brandishing charges. The question is not whether King's willful commission of the general intent crime of brandishing is relevant to prove intent to murder, but whether evidence of the brandishing incident allows an intent on King's part to be inferred, independent of the definition of the crime, that is relevant to prove or disprove King's intent during the shooting incident.

At the hearing on the motion to sever, King's counsel made it clear that the defense would be relying on a theory of self-defense. In closing argument, King's counsel told the jury that self-defense was "the issue in this case." Thus, King himself placed his mental state squarely before the jury. Evidence that less than three hours after the shooting incident, King used the firearm with the intent of intimidating someone with whom he was having a verbal argument (an offensive use) supports the inference that King had earlier employed the gun with similar intent, and not with an intent consistent with defensive use. Accordingly, evidence of King's intent during the brandishing incident was relevant to the jury's consideration of whether King

---

place. My client admitted it, okay. You can find him guilty of that. Those counts aren't an issue."

11

had acted in self-defense and it had substantial probative value because the brandishing so closely followed the shooting.[14]

In a hypothetical separate trial on the shooting charges, the People could have legitimately sought to admit evidence concerning the brandishing incident, pursuant to Evidence Code section 1101, subdivision (b).[15] In such a case, the court would have to determine whether, "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

" ' "Prejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a [Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice . . . .' 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code]

---

[14] In his opening brief, King discussed intent with reference to the crimes with which he was charged, but failed to discuss the elements of his defense of self-defense and the relevance that the intent shown by the brandishing incident had for the jury's consideration of that defense.

[15] Evidence Code section 1101, subdivision (a) provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." However, Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)  There was nothing about the brandishing incident that would uniquely evoke an emotional bias against King.  Nor was its probative value as a counter to King's assertion of self-defense outweighed by the time consumed in presenting the evidence.  Accordingly, we have no reason to believe that a trial court would exercise its discretion to deny admission of the brandishing incident evidence.

In hypothetical separate trials of the shooting and the brandishing charges, the evidence would have been cross-admissible.  The general rule is that if the evidence is cross-admissible, an argument that the trial court abused its discretion in denying a motion to sever fails.  There is nothing about this case that argues for an exception to the general rule.[16]  We conclude that there was no abuse of discretion by the court when it denied King's motion for severance of charges.

## D.  *Joinder of the Charges did not Deprive King of Due Process*

" '[E]ven if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts . . . for trial resulted in gross unfairness depriving the defendant of due process of law.' " (*Soper*, *supra*, 45 Cal.4th at p. 783.)  King contends that such was the result in his case.

We reject King's contention.  " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.]  Only

---

[16]  If a reviewing court finds that evidence concerning properly joined charges would not be cross-admissible in separate trials, then the court considers additional factors:  "(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case." (*Soper*, *supra*, 45 Cal.4th at p. 775.)  The first of these factors was involved in our analysis above.  The last does not apply to this case.  Despite King's argument otherwise, the cases against King for both the shooting and the brandishing were strong.

under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229, quoting *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920.)  We have determined that the jury could properly draw inferences from the brandishing incident concerning King's intent during the shooting incident.  Accordingly, King's assertion that he was denied due process fails.

**II.** *The Sentence did not Constitute Cruel and Unusual Punishment*

Prior to sentencing, King requested that the court dismiss the enhancements under section 12022.53, subdivisions (a)-(d) "to avoid cruel and unusual punishment and in the furtherance of justice under [section] 1385."  The court denied King's request.  Pursuant to section 12022.53, subdivision (d), the court imposed a prison term of 25 years to life as a component of King's sentence.  King contends that his "sentence was an abuse of discretion which resulted in a violation of due process and the prohibition against cruel and unusual punishment."  We disagree.

The court had no discretion to dismiss the section 12022.53 enhancement. (§ 12022.53, subd. (h) ["Notwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section."])  Nonetheless, " 'the courts examine whether a punishment is grossly disproportionate to the crime.' " (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1045.)  Accordingly, we reject King's abuse of discretion argument and consider only whether his sentence violated the state or federal prohibitions against cruel and unusual punishment.

" 'The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Ewing v. California* (2003) 538 U.S. 11, 23 (plur. opn. of O'Connor, J.).)  "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." (*Rummel v. Estelle* (1980) 445 U.S. 263, 272.)

Here, if we consider the gravity of King's offense to the harshness of the penalty, we find no gross disproportionality. "The gravity of an offense can be assessed by comparing the harm caused or threatened to the victim or society and the culpability of the offender with the severity of the penalty." (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1077.) The harm that King caused Turl was significant. The bullet pierced two segments of Turl's colon and his kidney and was permanently lodged next to his spine. Turl has trouble walking 80 percent of the time and is in constant pain. He is unable to play with his children as he used to and has lost his career. The harm threatened Turl was even more severe: the bullet came within an inch of his aorta and he would have bled to death in 5 to 10 minutes had the bullet struck there.

King's actions also threatened society. At sentencing, the court quoted the probation officer's report: "The defendant fired a handgun in a residential area that was very populated. His reckless actions and blatant disregard for the safety of the public could have resulted in additional victims."

King was highly culpable—he admitted that he intentionally discharged his firearm at a group of people when they were 10 to 15 feet away from his car. In comparison to the harm that King caused and his level of culpability, a sentence of 31 years to life in prison is not so extreme as to be grossly disproportionate.

" 'In determining whether a particular sentence constitutes cruel or unusual punishment under the state Constitution (art. I, § 17), we must determine whether the penalty "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' " (*People v. Dennis* (1998) 17 Cal.4th 468, 511.) Courts examine the nature of the offense and offender, compare the punishment with the penalty for more serious crimes in the same jurisdiction, and measure the punishment to the penalty for the same offense in different jurisdictions. (*In re Lynch* (1972) 8 Cal.3d 410, 425-427 [superseded on other grounds as stated in *People v. Caddick* (1984) 160 Cal.App.3d 46, 51-52].)

As for the nature of the offender, King cites his youth and lack of prior criminal conviction. He relies on *Graham v. Florida* (2010) 560 U.S. 48. In *Graham*, the court

15

held that the Eighth Amendment prohibits juveniles who have not committed homicide crimes from being sentenced to life without the possibility of parole. (*Id.* at p. 82.) However, King was not a minor at the time of his offense and his sentence is not tantamount to life without the possibility of parole. (See *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220-1221.)

King compares the sentence he received to the maximum sentence he could have received on the counts for which he was found guilty, excluding the section 12022.53, subdivision (d), enhancement. This is not relevant to our analysis, in which we might consider whether, had King committed more serious crimes, he would have received lesser punishment. We need only note that section 12022.53, subdivision (d), applies to a wide range of felonies:[17] those "specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100" when the defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death." (§ 12022.53, subd. (d).)

King presents no evidence or argument concerning the punishment for the same offense in different jurisdictions.

King's youth and lack of criminal history do not mitigate the harm caused and threatened to Turl and to society. "A defendant has a 'considerable burden' to show a punishment is cruel and unusual." (*People v. Meneses* (2011) 193 Cal.App.4th 1087, 1092-1093.) King has not satisfied that burden.

---

[17] King does compare his sentence to that which he might have received had he been convicted of an intentional shooting from a vehicle resulting in death (§ 190, subd. (d)). He notes that his sentence "was greater than the 20 years to life sentence" he would have received under that section of the Penal Code. However, King fails to take into account the fact that a charge under section 190, subdivision (d), may also be accompanied by a section 12022.53, subdivision (d), allegation, which if found true, will result in a sentence of 45 years to life. Thus, the more serious crime (§ 190, subd. (d)), if accompanied by the same enhancement to which King was subject, results in a longer sentence than King received. This does not assist King's argument.

**III.** *King was Sentenced Correctly*

On count 2, the court imposed and stayed a concurrent middle term of three years plus a stayed upper term of 10 years for the personal use of a firearm, stating that the upper term was justified by appellant's firing of more than one round. On count 3, the court imposed and stayed a concurrent middle term of two years, enhanced by a stayed term of three years for resulting great bodily injury.

King contends that, pursuant to section 1170.1, subdivision (a), "correct sentencing procedure was to impose and then stay a consecutive sentence of one third the mid-term for the subordinate counts [counts 2 and 3]."

Section 1170.1, subdivision (a), provides, in relevant part: "(a) Except as otherwise provided by law, and subject to Section 654, when any person is convicted of two or more felonies, . . . and a consecutive term of imprisonment is imposed under Sections 669 and 1170, the aggregate term of imprisonment for all these convictions shall be the sum of the principal term, the subordinate term, and any additional term imposed for applicable enhancements for prior convictions, prior prison terms, and Section 12022.1. The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements. The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, and shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses."

King has misread section 1170.1, subdivision (a), because, by its own terms, it applies only to consecutive sentences, and not to the concurrent sentences imposed on counts 2 and 3. (See *People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164 ["[t]he one-third-the-midterm rule of section 1170.1, subdivision (a), only applies to a consecutive sentence, not a sentence stayed under section 654"].) The reason for this is so that if any of the counts are invalidated on appeal, a stayed sentence on the remaining count or counts will serve as the principal term and "will ensure that defendant's punishment is commensurate with his criminal liability." (*Ibid.*)

17

## DISPOSITION

The judgment and sentence of the trial court are affirmed.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Richman, J.

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18